(January 9, 2003)

■ P.T. BANK CENTRAL ASIA, NEW YORK BRANCH, Appellant,
v ABN AMRO BANK N.V., Respondent. [754 NYS2d 245] —Order,
Supreme Court, New York County (Charles Ramos, J.), entered
September 20, 2001, which granted defendant's motion pursu-
ant to CPLR 3211 to dismiss the complaint, unanimously mod-
ified, on the law, to the extent of denying the motion with re-
spect to the fraudulent misrepresentation and concealment
causes of action, and otherwise affirmed, without costs.

Plaintiff's complaint arises out of two loan transactions and
a Participation Agreement related to one of the loans. The first
loan, a $270 million Replacement Credit Facility—otherwise
known as the Senior Loan—was made by defendant ABN
AMRO Bank N.V. (ABN), along with other banks, to Pioneer
Resources, LCC (Pioneer), a logging and timber company that
owned parcels of land and timber in the Pacific Northwest. The
Senior Loan is governed by the Senior Credit Agreement be-
tween ABN and the other lending banks on the one side and
Pioneer, as the borrower, on the other.

The second loan, the Bridge Loan Facility—or the Bridge
Loan—was a transaction in which ABN and other banking
institutions advanced $35 million to Strategic Timber Trust II,
LLC (Strategic Trust) to pay certain transactional fees associ-
ated with the acquisition of an ownership interest in Pioneer
by a third entity, Strategic Timber Partners II, LP (Strategic
Partners). The Bridge Loan was governed by a Bridge Loan
Agreement between ABN, along with the other lending institu-
tions, and Strategic Trust.

The collateral for both the Senior and Bridge Loans was the
timberland and timber inventory then owned by Pioneer. The
ultimate purposes of the two loans were to permit Pioneer to
restructure its existing debt and to enable Strategic Trust to
obtain title to Pioneer-owned timberland and timber inventory
in California, Oregon and Washington State. The Senior and
Bridge Loans were then to be paid through the proceeds of a
public offering of Strategic Trust or its related operating entity
as a real estate investment trust, with the collateralized
timberland and inventory to be used to substantiate the public
offering.

ABN was the syndication agent for the Senior Loan and the
administrative agent for the Bridge Loan. Under the Bridge
Loan Agreement, as the designated administrative agent for
the Bridge Loan, ABN was responsible for the collection of the
funds from the lending banks and the disbursement of the loan

funds to the borrower, Strategic Trust. Pursuant to the Bridge Loan Agreement, such funds were to be collected and distributed, and the loan was to close, only after ABN, as administrative agent, had determined that all conditions precedent to the making of the Bridge Loan had been satisfied. Among the preconditions set by the Bridge Loan Agreement was the requirement that ABN have received an appraisal demonstrating that the value of Pioneer's merchantable timber, at the time of the closing, was at least $410 million and that the value of Pioneer's land and timber together was at least $470 million. The Bridge Loan Agreement also required that Pioneer execute and deliver a guaranty of Strategic Trust's repayment obligations in the event that Strategic Trust failed or was unable to meet those obligations. Under the terms of the Bridge Loan, the Bridge Loan Lenders' right to payment under the Pioneer Guaranty was subordinate to the Senior Loan obligations. The requisite appraisals and the Pioneer Guaranty were apparently received by ABN, and the Senior and Bridge Loans closed on October 9, 1998.

A number of months subsequent to the closing of the loans, ABN, acting as administrative agent under the Bridge Loan Agreement, solicited other smaller banking institutions, including plaintiff, to purchase participation interests in the $35 million Bridge Loan. Plaintiff alleges that, as part of its solicitation, ABN represented, through its senior vice-president, that ABN was an expert in structuring the kind of financing for the timber industry involved in the Pioneer transaction and that participating in the Bridge Loan presented little or no risk to plaintiff because the collateral—the timberland and timber inventory—had an appraised value of $470 million, substantially in excess of the $305 million total loan package. In addition, ABN provided plaintiff with a "Summary of Terms and Conditions" of the Bridge Loan Agreement, which reiterated the conditions precedent set forth in the Bridge Loan Agreement for the making and closing of the Bridge Loan, including the requirement that ABN have received an appraisal of the collateral in the amount of at least $470 million, which confirmed for plaintiff ABN's alleged oral representations about the value of the loan collateral.

According to the complaint, plaintiff, acting in reliance on ABN's representations, accepted ABN's proposal and purchased a $1 million participatory interest in the Bridge Loan. Plaintiff's participation in the Bridge Loan is memorialized in and governed by a nonrecourse Participation Agreement, dated January 25, 1999, between ABN and plaintiff. The Participa-

tion Agreement incorporates by reference the Bridge Loan Agreement and grants plaintiff a 1/35th participation interest in "all [ABN's] right, title and interest as a Lender under the [Bridge Loan] Agreement." The Participation Agreement also includes a disclaimer, in which ABN disclaims responsibility to plaintiff for, inter alia, any representations included in the Bridge Loan Agreement or any of its related documents, which presumably included the appraisal. The Participation Agreement also included a limitation of liability clause, which provided that ABN would only be liable to plaintiff for any actions taken or omitted in "bad faith, gross negligence or willful misconduct."

As it turned out, the planned public offering was cancelled when it was discovered that the value of the collateral underlying the loans and intended to substantiate the stock offering had been substantially overstated. When the public offering was derailed, the borrowers defaulted on the loans and, as a result, plaintiff lost its $1 million participation investment. Plaintiff subsequently commenced this action against ABN for breach of contract, fraudulent misrepresentation, and fraudulent failure to disclose material information. ABN's preanswer motion to dismiss the complaint in its entirety was granted by Supreme Court, and plaintiff appeals.

Underlying all three causes of action are plaintiff's allegations that, at the time ABN was soliciting plaintiff to participate in the Bridge Loan, ABN possessed documents and information indicating that the collateral supporting both the Senior Loan and the Bridge Loan—and which was to be used to substantiate the expected public offering—had been significantly overvalued in the appraisal that was a prerequisite to the closing of both loans, and that, despite having such information, ABN fraudulently misrepresented to plaintiff that the value of the collateral was at least $470 million or fraudulently failed to disclose the information it had that called into question the appraised value of the loan collateral.

The scope of a court's inquiry on a motion to dismiss under CPLR 3211 is narrowly circumscribed. The court must "accept the facts alleged as true * * * and determine simply whether the facts alleged fit within any cognizable legal theory" (*Morone v Morone*, 50 NY2d 481, 484 [citation omitted]; *see also Guggenheimer v Ginzburg*, 43 NY2d 268, 275). The complaint must be construed "liberally" (CPLR 3026; *see New York Trap Rock Corp. v Town of Clarkstown*, 299 NY 77), and the court must accept as true not only "the complaint's material allegations" but also "whatever can be reasonably inferred there-

from" in favor of the pleader (*McGill v Parker*, 179 AD2d 98, 105; *see also Cron v Hargro Fabrics*, 91 NY2d 362, 366). In ruling on a motion to dismiss, the court is not authorized to assess the merits of the complaint or any of its factual allegations, but only to determine if, assuming the truth of the facts alleged, the complaint states the elements of a legally cognizable cause of action.

To state a legally cognizable claim of fraudulent misrepresentation, the complaint must allege that the defendant made a material misrepresentation of fact; that the misrepresentation was made intentionally in order to defraud or mislead the plaintiff; that the plaintiff reasonably relied on the misrepresentation; and that the plaintiff suffered damage as a result of its reliance on the defendant's misrepresentation (*see e.g. Swersky v Dreyer & Traub*, 219 AD2d 321, 326). A cause of action for fraudulent concealment requires, in addition to the four foregoing elements, an allegation that the defendant had a duty to disclose material information and that it failed to do so (*Wiscovitch Assoc. v Philip Morris Cos.*, 193 AD2d 542). In addition, in any action based upon fraud, "the circumstances constituting the wrong shall be stated in detail" (CPLR 3016 [b]).

Supreme Court dismissed the fraudulent misrepresentation and concealment claims on the grounds that the complaint failed to include an allegation that defendant intended to deceive plaintiff or to conceal material information and that plaintiff, as a matter of law, was precluded by the terms of its agreement with ABN from asserting that it reasonably relied on any misrepresentations by ABN.

The complaint alleges, inter alia, that, at the time ABN solicited plaintiff's participation in the Bridge Loan, (1) ABN was a principal lender in the Senior and Bridge Loans, the syndication agent for the Senior Loan, the administrative agent for the Bridge Loan, and a self-described expert in timberland financing; (2) ABN, by virtue of its special position in the Pioneer timberland financing transactions, possessed specific knowledge and information, including "appraisals, financial statements, reports of consultants and other information," establishing that the value of the collateral for the Senior and Bridge Loans had been significantly overstated by the appraisal that was a prerequisite of the Bridge Loan; (3) despite this knowledge and information, ABN represented to plaintiff that the value of the loan collateral was in excess of the total amount of the loans; (4) ABN knew these representations were false; and (5) ABN misrepresented the value of the loan collat-

eral, or failed to disclose that the value was not as stated in the appraisal, "in order to decrease its own financial exposure under Bridge Loan Agreement and in order to receive funds to disburse to itself as fees for acting as the Syndication Agent and Administrative Agent under the loan agreements."

Accepting the allegations of the complaint as true and construing the inferences that may be drawn from those allegations in plaintiff's favor, as we must, we believe the foregoing sufficiently allege that ABN intentionally misrepresented or failed to disclose material facts. Although Supreme Court found fault in plaintiff's failure to allege how or when ABN assertedly obtained information demonstrating that the appraised value was overstated, neither CPLR 3016 (b) nor any other rule of law requires a plaintiff to allege details of the asserted fraud that it may not know or that may be peculiarly within the defendant's knowledge at the pleading stage. CPLR 3016 (b) "requires only that the misconduct complained of be set forth in sufficient detail to clearly inform a defendant with respect to the incidents complained of and is not to be interpreted so strictly as to prevent an otherwise valid cause of action in situations where it may be 'impossible to state in detail the circumstances constituting a fraud' " (*Lanzi v Brooks*, 43 NY2d 778, 780, quoting *Jered Contr. Corp. v New York City Tr. Auth.*, 22 NY2d 187, 194). Nor, contrary to the suggestion of Supreme Court, must plaintiff produce evidence at this stage of the proceedings to support its contentions as to what ABN knew about the true value of the collateral when it solicited plaintiff's participation in the Bridge Loan.

Supreme Court's ruling that the disclaimer provision in the Participation Agreement precluded plaintiff, as a matter of law, from asserting "justifiable reliance" on any purported misrepresentation or failure to disclose by ABN based upon *Danann Realty Corp. v Harris* (5 NY2d 317) was erroneous as well. In *Danann Realty*, the plaintiff-purchaser complained that it was induced to enter into a contract of sale of a building lease because of oral misrepresentations by the seller regarding the operating expenses of the building and expected profits to be earned. The Court of Appeals held that a disclaimer provision in the parties' agreement, in which the plaintiff expressly acknowledged that the seller had made no extra contractual representations regarding the building's operating costs or potential profit and disclaimed any reliance on any such representations precluded the plaintiff from later alleging that it had justifiably relied on alleged misrepresentations by the seller. In contrast, the Participation Agreement in the present

case precludes the plaintiff's reliance on any misstatements *in the Bridge Loan Agreement documents*: "We [ABN] shall have no responsibilities except those expressly set forth herein or in the [Bridge Loan] Agreement and the documents related thereto. We shall not be responsible to you for (I) any recitals, statements, representations or warranties contained in any of the aforesaid documents or in any certificate or other document referred to or provided for therein * * * You are able to make and have made your own independent investigation and determination of the foregoing matters and you accept your responsibility therefore * * *." However, the essence of plaintiff's complaint is not that plaintiff relied on the erroneous appraisal or other Bridge Loan documents but that plaintiff relied on *ABN's representations* to plaintiff regarding the value of the collateral. The disclaimer in the Participation Agreement might preclude a claim by plaintiff based upon representations made in the Bridge Loan documents, but it does not preclude plaintiff's claim based upon representations that ABN made to plaintiff that ABN allegedly knew were false, albeit supported by the appraisal, which ABN allegedly knew was erroneous.

In addition, plaintiff's allegation that, by virtue of its unique position in the Senior and Bridge Loan transactions, ABN had information, not readily available to plaintiff, demonstrating that the appraisal required by the Bridge Loan Agreement was overstated when it solicited plaintiff's participation in the Bridge Loan brings plaintiff's complaint within the "special facts" doctrine. Under that doctrine, a duty to disclose arises "where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair" (*Chiarella v United States*, 445 US 222, 248; *see also Swersky v Dreyer & Traub*, 219 AD2d 321, 327-328; *accord Kimmell v Schaefer*, 89 NY2d 257, 263; *Par Plumbing Co. v Engelhard Corp.*, 256 AD2d 124; *Merrill Lynch, Pierce, Fenner & Smith v Chipetine*, 221 AD2d 284, 285). While the evidence might ultimately demonstrate that the information ABN allegedly had regarding the true value of the loan collateral was either nonexistent or available to plaintiff with the exercise of reasonable diligence—and thus that ABN did not misrepresent what it knew about the value of the collateral or that plaintiff was not justified in relying on ABN's misrepresentations—it is inappropriate to determine those issues as a matter of law based solely on the allegations in plaintiff's complaint, at this point in the proceedings.

Plaintiff's breach of contract claim presents a different story.

The complaint alleges that ABN breached its agreement with plaintiff by closing on the Bridge Loan and disbursing the Bridge Loan funds when it knew or had reason to know that the value of the timberland collateral was less than the appraised value. This claim is based, not on any provision in the Participation Agreement, but on plaintiff's contention that the Bridge Loan Agreement, to which plaintiff is not a party, is incorporated wholesale into the Participation Agreement and that a breach of the Bridge Loan Agreement thus constitutes a breach of the Participation Agreement. Nonetheless, the breach of contract claim fails, as a matter of law, for several reasons.

Plaintiff's relationship with ABN was created and is governed by the Participation Agreement, and that Agreement expressly endows plaintiff, as a participant in the Bridge Loan, with a pro rata share of all ABN's "right, title and interest as a Lender under the [Bridge Loan] Agreement."[1] However, plaintiff cannot claim that alleged acts taken by ABN before plaintiff entered into the Participation Agreement (ABN's closing of the Bridge Loan and disbursement of Bridge Loan funds) constituted a prospective breach of the Participation Agreement that was nonexistent at the time of the alleged breach. While acts taken by ABN in breach of its obligations under the Bridge Loan Agreement after plaintiff entered into the Participation Agreement might conceivably give rise to a breach of contract claim,[2] actions taken months before the Participation Agreement was even drafted cannot give rise to such a claim. Plaintiff's contractual rights began once it had entered into its Participation Agreement with ABN.

Furthermore, plaintiff has failed to allege any act by ABN that could constitute a breach of the Bridge Loan Agreement. That Agreement requires only that ABN have received an appraisal valuing the total timberland collateral at a minimum of $470 million before closing on the Bridge Loan and disbursing the Bridge Loan funds to the borrower. The complaint does not allege that ABN closed and disbursed the Bridge Loan funds without having received the requisite appraisal, but, rather, that ABN did so knowing the appraisal was wrong. Even if the latter allegation could be proved, such action by ABN, whatever else it might be, would not constitute a breach of either the Bridge Loan Agreement or the Participation Agreement.

---

1. While this provision does not expressly incorporate all the terms of the Bridge Loan Agreement into the Participation Agreement, it does define plaintiff's contractual rights as arising out of the Bridge Loan Agreement.

2. However, any such claims that might exist would be subject to the limitations set forth in the Bridge Loan Agreement.

Plaintiff's additional contention that ABN's execution of the Pioneer guaranty, which subordinated the rights of the Bridge Loan lenders to those of the Senior Loan lenders, constituted a breach of its agreement with ABN is even more untenable. Again, the act complained of—the execution of the Pioneer guaranty—occurred concurrently with the closing of the Bridge Loan, months before plaintiff entered into the Participation Agreement with ABN. Moreover, there is nothing in the Participation Agreement or Bridge Loan Agreement that could remotely be construed as prohibiting ABN from executing the Pioneer guaranty. Indeed, the Participation Agreement does not even mention the guaranty, and the Bridge Loan Agreement both defines the Pioneer guaranty as one under which "the right to payment * * * shall be subordinate to the Senior Loan Obligations" and *requires* its execution and delivery as a condition precedent to the closing of the Bridge Loan. Thus it is hard to fathom how ABN's execution of the Pioneer guaranty, which provides exactly what is defined to do, could be construed as a breach of any agreement. Concur—Mazzarelli, J.P., Sullivan, Rosenberger, Williams and Gonzalez, JJ.